**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0628-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

COWAN RAINEY, a/k/a
SEAN NAUGHTON,
IAN FARRAR, and
IAN FERRARA,

    Defendant-Appellant.

_____

Argued October 21, 2025 – Decided February 20, 2026

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 21-11-1514.

Nadine Kronis, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Nadine Kronis, of counsel and on the briefs).

Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Melinda A. Harrigan, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Following a jury trial, defendant Cowan Rainey was convicted of second-degree robbery, N.J.S.A. 2C:15-1, and sentenced to an extended term of eighteen years in prison, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The charge stemmed from a marijuana purchase in a Krauszer's parking lot that turned into a robbery when defendant allegedly brandished a handgun at the buyer, Edward Byham, and grabbed Byham's money without tendering the marijuana. Codefendant Daryl Pelzer grabbed Byham's cell phone. At trial, during which Byham and Pelzer testified for the State and defendant testified on his own behalf, the facts surrounding the robbery were sharply disputed. The responding officer, Ocean Township Patrolman Domenic Pedone, testified about the substantive content of a store surveillance video he viewed that purportedly captured the incident. Pedone used his body worn camera to make still shots from the surveillance

2

video, which he discussed during his testimony. The State did not obtain a copy of the surveillance video or present it at trial.

On appeal, defendant raises the following points for our consideration:

POINT I

OFFICER PEDONE'S IMPROPER TESTIMONY SUMMARIZING AN ABSENT SURVEILLANCE VIDEO IN VIOLATION OF N.J.R.E. 701, N.J.R.E. 901 AND N.J.R.E. 1002 DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

A.      Officer Pedone's Summary Of Surveillance Video Footage – Which Was Not In Evidence – Was Inadmissible Because It Violated The Best Evidence Rule And Authentication Requirements.

B.      Officer Pedone's Narration Of The Absent Surveillance Video Was Impermissible Lay Witness Testimony Where He Did Not Witness The Events Depicted In The Video Firsthand And Testified To Key Factual Disputes In The Case.

C.      Officer Pedone's Improper Testimony Regarding The Missing Video Was Extremely Harmful Because It Bolstered The State's Otherwise Weak Case.

D.      Alternatively, Even If Officer Pedone's Testimony Regarding The Video Was Admissible, The Court Erred In Failing To Give An Adverse Inference Instruction.

3

POINT II

THE COURT'S FAILURE TO ADMIT BYHAM'S WRITTEN STATEMENT INTO EVIDENCE WAS ERRONEOUS AND HIGHLY PREJUDICIAL WHERE BYHAM'S READING OF THE STATEMENT INTO THE RECORD DIVERGED SUBSTANTIALLY FROM THE WRITTEN STATEMENT ITSELF.

POINT III

PELZER'S TESTIMONY OPINING ON THE STATEMENTS OF OTHER WITNESSES AND ALLUDING TO FINGERPRINT EVIDENCE OUTSIDE THE RECORD WAS ENTIRELY IMPROPER AND DEPRIVED [DEFENDANT] OF A FAIR TRIAL. (NOT RAISED BELOW).

    A.    Pelzer's Mischaracterization Of Byham's Statements As Identifying [Defendant] As The Man Who Had Gotten Into Byham's Car Was Improper And Prejudicial Lay Opinion Testimony.

    B.    Pelzer Improperly Testified As An Expert Regarding Fingerprint Evidence Not In The Record. This Testimony Was Inadmissible Hearsay And Violated [Defendant's] Right To Confrontation.

POINT IV

THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT A FAIR TRIAL. (NOT RAISED BELOW).

POINT V

RESENTENCING IS REQUIRED BECAUSE THE COURT FAILED TO FIND TWO APPLICABLE MITIGATING FACTORS AND THE COURT DID NOT PROVIDE REASONS FOR IMPOSING NON-STATUTORY FINES.

A.    The Court's Failure To Properly Address, Find, And Weigh Two Applicable Mitigating Factors Was Error.

B.    The Trial Court Erred In Imposing Discretionary Fines Without Making Required Findings Or Providing Reasoning On The Record.

POINT VI[1]

RESENTENCING IS REQUIRED BECAUSE SENTENCING [DEFENDANT] TO AN EXTENDED TERM AS A PERSISTENT OFFENDER VIOLATED HIS SIXTH AMENDMENT RIGHTS. (NOT RAISED BELOW).

In a supplemental brief,[2] defendant raises the following points:

POINT I

DEFENDANT ALLEGES THAT THE STATE VIOLATED BOTH HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHTS AND HIS SIXTH AMENDMENT SPEEDY TRIAL RIGHTS,

---

[1]  By leave granted, Point VI was added in a supplemental filing.

[2]  We granted defendant's motion to file a self-represented supplemental brief.

5                                              A-0628-23

RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION.

POINT II

DEFENDANT ALLEGES THAT THE STATE VIOLATED BOTH HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHTS AND HIS SIXTH AMENDMENT SPEEDY TRIAL RIGHTS, RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION.

POINT [III]

[DEFENDANT'S] FARETTA[3] RIGHTS [WERE] VIOLATED.

POINT IV

THE CUMULATIVE IMPACT OF THE ERRORS DEPRIVED [DEFENDANT] OF DUE PROCESS AND COUNSEL CLAUSE-FARETTA RIGHTS.

Because we agree the trial judge erred in allowing testimony by the responding officer regarding the contents of the surveillance video that was never produced by the State nor shown to the jury, thereby violating the best evidence rule and running afoul of the precepts in State v. Watson, 254 N.J. 558

---

[3] Faretta v. California, 422 U.S. 806 (1975) (recognizing a criminal defendant's right to self-representation). About a year prior to the trial commencing, the trial judge granted defendant's motion to represent himself and appointed a Monmouth County public defender as standby counsel. Just prior to jury selection, the judge revoked defendant's self-represented status and ordered standby counsel to assume defendant's representation.

6

(2023), and State v. Allen, 254 N.J. 530 (2023), governing police lay opinion narration testimony of surveillance videos, we reverse.

I.

We glean these facts from the five-day trial conducted between June 28 and July 7, 2023.

On the evening of August 1, 2021, Pedone, who had been an Ocean Township Police Department patrolman for about three years, was dispatched to the Krauszer's on Deal Road in Ocean Township in response to "an armed robbery that had just occurred" involving three possible suspects. Upon arrival, Pedone "made contact with the victim, Edward Byham," "set up a perimeter," and "secured the store." Next, Pedone questioned a store employee about any "surveillance footage that would have captured the incident." The employee confirmed there was surveillance footage but "he was unable to access it" and "would have to contact his manager."

Once the manager arrived, Pedone "was able to observe the footage" as it was replayed on a monitor in the store but was unable to preserve a video copy of the footage or copy it onto a disk because it was a new surveillance system

A-0628-23

that the manager did not understand.[4]  As Pedone reviewed the footage, he "was able to pause [it]," and use his body worn camera (BWC) to take "screen shots" and "still shots" of individuals depicted in the footage.

During his testimony, Pedone identified S-3, a still shot taken with his BWC, as depicting "Suspect 1," whom he described as a "black male," "bald with a beard," "wearing [a] gray hoodie."  S-3 was admitted into evidence without objection.  Pedone also identified S-2, another still shot taken with his BWC, as depicting "Suspect 2."  S-2 was also admitted into evidence without objection.

Pedone described what he observed when he watched the surveillance footage.  He recounted "observ[ing] the suspect's vehicle pull into the west lot of Krauszer's."  He stated he observed Suspect 1 "[exit] out of the driver's seat of the vehicle."  Then, the following exchange occurred during Pedone's direct examination:

> Q.  And with regards to this individual, what did you observe this individual do on the surveillance footage after they got out of the vehicle?

---

4    Although the manager told Pedone he would "contact the company," presumably to allow someone with the appropriate expertise to recover the surveillance footage, nothing in the record revealed whether the police or the prosecutor made any attempt to obtain a copy of the surveillance footage after the night of the incident.

A. From there, I watched the surveillance footage where I observed him exit the vehicle. Suspect 1 then starts walking towards the front of the store of Krauszer's, where he approaches the victim's vehicle, Edward Byham[.]

From there, I observe him get into the front passenger seat of the vehicle, where then it becomes dark and you can't see anything further.

Q. Now, after you saw this individual get into the passenger seat of the victim's vehicle on the surveillance footage, what did you observe next on the footage?

A. I then observed . . . another male subject, black male. He gets out of the rear of the vehicle and goes to the driver's seat of the vehicle. The vehicle is then [driven] down the lot and turned back around to where the vehicle is now facing Deal Road.

From there, I then observed the driver get out wearing an all white hoodie, dark pants, and he had what I believed to be facial hair and short black hair. That's Suspect 2.

Pedone testified he observed Suspect 2 "walk over to the driver's side door" of Byham's car, "reach into the vehicle through the driver's side window" and appear to take "something." Pedone said the footage showed Suspect 2 then open the trunk of Byham's car, look through it, and close the trunk. Suspect 2 "then ultimately runs back to his vehicle and drives off."

9

According to Pedone, when Suspect 2 drove off, Suspect 1 "was still in the front passenger seat" of Byham's car. "Suspect 1 is then observed exiting [Byham's] vehicle, where it appears that he runs west towards a fence where the wood line is." Pedone testified:

> At that time, I then observed the victim, Edward Byham, get out of his car, where he begins to run in the direction of Suspect 1 at that time. And then [it] is observed that Suspect 1 turns and points an unknown object at the victim, Edward Byham, where it is observed that [Byham] falls to the ground and appears to duck for cover.

Pedone testified after Suspect 1 "turns and points the unknown object at the victim, it is then observed that he jumps over the fence and hops the wood line, where he takes off in an unknown direction."

Pedone further testified he had observed a third individual in the suspect vehicle, but "did not observe" that person "having any interaction with the incident" when he viewed the surveillance footage.[5] Pedone stated he "only observed Suspect[s] 1 and 2 having involvement where they approached the victim's vehicle and were involved in the incident."

_____

[5] The defense produced S-5, another still shot from Pedone's BWC, that showed a person wearing a dark jacket standing outside of the suspect vehicle, to contradict Pedone's testimony that the third individual never exited the vehicle. However, Pedone believed S-5 depicted Suspect 2 before he removed his jacket.

A-0628-23

Pedone also interviewed Byham about the incident. Byham had driven to the Krauszer's parking lot that evening because he had made arrangements to buy marijuana.[6] By the time of trial, Byham had experienced "a traumatic injury" unrelated to the robbery that caused "memory[] . . . impair[ment]." As a result, during his testimony, Byham recalled driving to the Krauszer's to meet someone but did not recall much else, stating:

> I don't really remember too much. I just remember I got into an argument, and I guess we were arguing for some point or I don't know exactly how long, and then the argument kept going, and then that was basically it. And then, he ended up getting out the car, I ended up getting out the car very briefly, and then I got back into the car, and then at some point I ended up leaving, and then . . . the police, I guess I seen them at some point after that.

Although Byham could not recall being robbed, he believed he had some money in the center console of his car that was missing after the incident and he could not recall whether he obtained the marijuana he went to purchase. Byham recalled giving a statement to the police but could not remember any details. At trial, although he identified his signature and initials on a five-page statement dated August 2, 2021, reviewing the document did not refresh his recollection as to its contents.

---

[6] Byham acknowledged having been previously convicted "of several things."

The statement was marked for identification but not admitted into evidence.  During his direct examination, Byham read the paragraph in the statement describing the incident into the record as follows:[7]

> I called this guy about weed.  He kept . . . telling me to . . . meet him certain places.  So, I got a funny feeling.  I ended up . . . meeting at Krauszer's.
>
> He text[ed] when he was on the way, I guess, three minutes away. . . .  They pull in and pull to the left side of the store.  I was thinking they were going to turn around.  They let a guy out of . . . the car and approached my car . . . at the front passenger door. . . .  I unlocked my car and let him in.
>
> We agreed on a quarter of weed. . . .  [T]he money was already in the center console prior to that, but I put the money in the center console.  Before I asked him where the weed was at, the money was grabbed.  He starts talking to me about a stack of money, hundred dollar bills which I saw were fake.  He tried to give me the hundred dollar bills for smaller bills, which called him on it, . . . and his whole demeanor changed.
>
> He took [his] hands out of his pocket and he pulled a gun out of his hooded sweatshirt pocket, which was wrapped in paper towel.  The gun was pointed towards my—pointed—pointed it at me, asked where the rest of the money [was].  Said was in the trunk.

---

[7]  N.J.R.E.  803(c)(5) allows the admission of a statement about which the witness has "insufficient present recollection" when the statement meets the other requirements of the rule.  Portions of the statement "may be read into evidence but shall not be introduced as an exhibit over objection."  Ibid.

His boy—he didn't believe me. This boy got out the car, went to the passenger side door on the left side, approached the driver's side door, and I opened the trunk of my door to get the button to open the trunk . . . .

. . . [A]nd then—my cell phone rang and my phone was grabbed from the side of my car where it was at. The guy at the window found the trunk, popped the trunk, went to the back of the trunk, . . . and then shut the trunk, and then walked off to the car that . . . was pulled up in. He jumped in the car and drove off.

Guy pointed the gun, tried to get in the car, but left. He tried jumping the fence, and that's when I got out and tried to approach him. When I got close to . . . him, turned around, and pointed it, and said, "come closer, I'll kill you." . . . [H]e jumped the fence and then ran. And then that's, I guess, some point after that the police were called.

In the statement, Byham described the man who entered his car and pointed a gun at him as an "[o]lder, mid 30s . . . [s]hort, black male," with a "scruffy beard" and wearing a "gray sweatshirt." Byham said he did not know the man's name, but called him "JJ." The gun had a "[b]lack handle with silver on the side." The person who approached the driver's side door and took his cell phone was described as a "[b]lack male wearing a hoodie." Byham identified this person as the one who drove the car. According to Byham's statement, the third suspect "stayed in the car," which was described as a "[f]our door silver sedan."

Ocean Police Department Detective Dean Schoch, "the on-call primary detective" at the time of the incident, responded to the crime scene "a little after

13

midnight" and also viewed the surveillance footage. By viewing the footage, Schoch was able to capture the registration number on the suspect vehicle and trace it back to the owner. The investigation ultimately led to Pelzer, who was determined to be a suspect. The suspect vehicle was also located and dusted for fingerprints, yielding "a hit on one of the fingerprints" for Pelzer. Byham's cell phone was also found in the area. The phone number for a "conversation" Byham had prior to the drug purchase was linked to Pelzer. Additionally, Byham positively identified Pelzer from "a photo line-up." After Pelzer was arrested, charged, and interviewed, charges were filed against defendant.

Although Pelzer and defendant admitted being present in the Krauszer's parking lot on the night of August 1, 2021, they provided widely divergent accounts of the incident at trial.[8]

Pelzer, who had entered a negotiated guilty plea to robbery, agreed to testify against defendant, and had previously been convicted of attempted murder, claimed he "did[ not] play a part in the robbery." He testified he had rented a vehicle through

---

[8] Both defendant and Pelzer confirmed that defendant was the individual depicted in S-3, whom Pedone had identified as "Suspect 1." Ocean Township Police Department Detective Zachary Rhein, who testified he was familiar with defendant "in general from the community," recognized defendant as the person depicted in S-3. Pelzer and defendant also identified the person depicted in S-2 as Pelzer.

a friend and was "just taking" defendant and another man "somewhere" to "meet somebody." When they reached Krauszer's, defendant "got out the car" and "went to" Byham's vehicle, leaving Pelzer in the rented car.

Pelzer testified after several minutes passed, he approached Byham's driver-side door "[t]o see what was taking so long." Pelzer claimed at the time he had no knowledge of any planned or ongoing robbery. He testified:

> When I get to the vehicle, I see the guy fidgeting like[,] . . . in fear. So, when I look, I see that it's what called a stage of a robbery. I don't know. I just see the guy's in fear.
>
> So, I see the phone. I take the phone. I grabbed it and I run. I leave him there and I take off. That—grabbed the phone for me to get up out of there. I throw it as soon as I get out . . . the incident into the woods. . . . I toss it. Never slammed it, [broke] it, damaged it, anything. I just got out.

According to Pelzer, he took Byham's phone because he did not know if Byham was going to "call the cops" and his immediate thought was just "to get away from this whole scene."

When asked on direct examination if he saw defendant "brandishing a handgun," Pelzer answered,

> All I seen was the dude fidgeting and jumping like this. I didn't go to (indiscernible) see anymore. I know it was for me to get up out of here. We in Ocean at

Krauszer's, and I'm getting up out of here. And I . . . took off.

According to Pelzer, he got back into his car and drove away, leaving defendant behind. He said he would never have gone to Krauszer's had he known a robbery would occur.

During his testimony, defendant admitted having numerous prior convictions for second- and third-degree crimes, and acknowledged he sold marijuana and K2, a synthetic marijuana. He said he received a call from Pelzer, who wanted to purchase some marijuana and K2, and they agreed to meet at Krauszer's. Defendant, who lived nearby, testified he went on foot and met Pelzer in the Krauszer's parking lot. Pelzer arrived driving a car and "[t]here was a guy in a Polo jacket" in the passenger seat.

While standing at the side of Pelzer's car, defendant handed Pelzer the amount of marijuana and K2 they had agreed upon on the phone. He then went inside the store and used the ATM while "waiting for [Pelzer] to deal with whoever he was going to deal with." According to defendant, the putative buyer was in another vehicle that had "backed up . . . to the building." Defendant believed he would be paid $100 for the drugs after the transaction was completed.

When defendant exited Krauszer's, Pelzer and Byham were involved in an altercation. Byham was "yelling about his phone," saying "dude, I need my . . .

16

phone." Defendant did not know what had happened between the two, and he did not ask any questions because "[i]t's not my business." He wanted to collect the money Pelzer owed him, but he did not want "to cause a scene" because he had more drugs in his possession.

According to defendant, Pelzer's car was facing in a different direction when defendant exited the store. Pelzer entered the car and the car pulled out, with the male in the Polo jacket now driving. After Pelzer and the other man drove away, defendant began leaving on foot. Byham followed him, yelling at him about his phone. During direct examination, defendant described the interaction as follows:

> A. As I'm walking back towards the gate in which I came in at, the guy, Byham, is behind me. He's . . . not that close, but he's yelling, dude, you know, I need my f-ing phone. And so, you know, I—
>
> Q. And was he directing that to you?
>
> A. I . . . felt like he was. You know, like he was because that's who I – he—he must have seen me deal with them. So, of course, I—you know, I believe it would be natural for him to say it to me. He wasn't accusing me of his phone [sic]. He was just saying like, dude, I need my—you know, I need my phone. That's why I turned around, and I told him, bro, I don't have nothing to do with that. You feel me? And . . . kept it moving.
>
> Q. Okay. And when you say you kept it moving, you just continued walking.

17

A-0628-23

A. Right. Other than me turning around to tell him I don't have . . . your phone. I have nothing to do with that, and I kept it moving.

Defendant claimed he "never gave anything to Byham" because Pelzer, not Byham, was his customer and what happened between Pelzer and Byham "wasn't [his] business." Defendant said he "had nothing to do with" Pelzer taking Byham's phone and adamantly denied getting into Byham's car. Defendant complained he "got beat out of a whole $100" because Pelzer never paid him for the drugs he had supplied.

On November 30, 2021, a Monmouth County grand jury returned an indictment charging defendant with second-degree robbery, N.J.S.A. 2C:15-1 (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count three); fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4) (count four); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count six). Pelzer was charged along with defendant in counts one through four. In counts five and six, Pelzer and defendant, respectively, were charged alone with certain-persons-not-to-have weapons offenses.

After two days of deliberations, the jury indicated it was unable to reach a unanimous verdict on all counts. After further instructions, the jury resumed deliberations but later informed the judge it could only reach a unanimous verdict on one count. With the parties' consent, the judge accepted a partial verdict of guilty to the robbery charge,[9] and the State agreed to dismiss the remaining counts. After sentencing, the judge entered a conforming judgment of conviction on October 3, 2023, and this appeal followed.

## II.

In Point I, defendant argues the judge erred by allowing Pedone's testimony regarding his observations of the events depicted in the Krauszer's surveillance video because: (1) it "violated the Best Evidence Rule and authentication requirements"; and (2) was "impermissible lay witness testimony." Alternatively, defendant argues, assuming the testimony was admissible, the judge erred by failing to give an adverse inference charge based on the State's failure to preserve the surveillance footage.

We review a trial court's evidentiary ruling for abuse of discretion. Allen, 254 N.J. at 543 ("We do not substitute our judgment for that of the trial court

---

[9] See State v. Shomo, 129 N.J. 248, 257 (1992) ("[T]rial courts possess the discretion to accept [partial] verdicts absent a showing of prejudice to the defendant.").

'unless the evidentiary ruling is "so wide of the mark" that it constitutes "a clear error in judgment."'" (quoting State v. Garcia, 245 N.J. 412, 430 (2021)). "Deference will not be afforded, however, if the court has misapplied the law to an evidentiary issue." State v. Williams, 471 N.J. Super. 34, 45 (App. Div. 2022) (citing State v. Hathaway, 222 N.J. 453, 467 (2015)).

N.J.R.E. 1002 provides "[t]o prove the content of a writing or photograph, the original writing or photograph is required except as otherwise provided in these rules or by statute." "'Photographs' include still photographs, X-ray films, videos, motion pictures and similar forms of reproduced likenesses." N.J.R.E. 1001(b).

> A "duplicate" is a counterpart, other than an original, produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and reductions, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent technique which accurately reproduces the original.
>
> [N.J.R.E. 1001(d).]

"A duplicate as defined by Rule 1001(d) is admissible to the same extent as an original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." N.J.R.E. 1003.

Under N.J.R.E. 1004,

The original is not required and other evidence of the contents of a writing or photograph is admissible if:

(a) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or

(b) Original not obtainable. No original can be obtained by any available judicial process or procedure or by other available means; or

(c) Original in possession of opponent. At a time when an original was under the control of the party against whom offered, that party was put on notice by the pleadings or otherwise that the contents would be a subject of proof at the hearing, and that party does not produce the original at the hearing; or

(d) Collateral matters. The writing or photograph is not closely related to a controlling issue and it would not be expedient to require its production.

Here, neither the original nor a duplicate of the surveillance video footage was produced at trial, and the judge did not make a finding that any of the N.J.R.E. 1004 exceptions applied to permit testimony regarding the contents of the surveillance video. Rather, the judge allowed Pedone's surveillance footage testimony, first, for the purpose of laying a foundation for the still shots admitted into evidence[10] and, later, as Pedone's "direct observations" of the surveillance

---

[10] The still shots were admissible as "duplicate[s]" of specific frames of the surveillance footage under N.J.R.E. 1001(d) and N.J.R.E. 1003. Pedone

footage. However, unless one of the N.J.R.E. 1004 enumerated exceptions applies, testimony regarding the contents of the surveillance footage beyond what was captured in the still shots was inadmissible. See State v. Moore, 158 N.J. Super. 68, 82 (App. Div. 1978) ("The Best Evidence Rule . . . requires production of an original writing unless the proponent establishes that its nonproduction is excused for one of a number of reasons . . . .").

We are convinced none of the N.J.R.E. 1004 enumerated exceptions apply here. Subsections (c) and (d) are clearly inapplicable because the surveillance video was never in defendant's possession, N.J.R.E. 1004(c), and was unquestionably "closely related to a controlling issue" in the case, N.J.R.E. 1004(d). Regarding subsection (a), rather than establishing the video was innocently "lost" or "destroyed," the testimony only demonstrated that the Krauszer's store surveillance system was new, that neither the store manager nor

---

testified about the creation of the still shots from the surveillance footage with his BWC. See, e.g., State v. Brown, 463 N.J. Super. 33, 51 (App. Div. 2020) ("The authentication rule 'does not require absolute certainty or conclusive proof.'" (quoting State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999))). On appeal, defendant contends the still shots were improperly authenticated because no "eyewitness to the events depicted" confirmed their accuracy. Defendant's contention is unpersuasive because he did not dispute that the stills captured persons who were present in the Krauzser's parking lot at the relevant time, including himself, and two of the still shots were admitted into evidence without objection.

clerk at the scene knew how to make a copy of the video, and the manager would "contact the company." Nothing in the record revealed any further effort or attempt by the State to obtain a copy of the surveillance footage after the night of the incident. See Lubarr v. Royal Woodwork, Inc., 70 N.J. Super. 1, 8 (App. Div. 1961) (noting that "secondary evidence may be received to prove the contents of the original" where the original would have been admissible and "nonproduction of the original is accounted for").

As to subsection (b), we reject the State's contention that it applies by virtue of Pedone's testimony that "he asked for—and tried to obtain through multiple employees—a copy of the footage while he was on scene" but was not able to do so "[t]hrough no fault of his own." We are not convinced Pedone's cursory efforts met the State's burden of establishing the original footage was "not obtainable" by "any available judicial process or procedure or by other available means" to meet the requirements of N.J.R.E. 1004(b). Indeed, Pedone's failure to simply record the entire surveillance footage with his BWC after being told that the store employees did not know how to save the footage onto a DVD is inexplicable. See Moore, 158 N.J. Super. at 84 (rejecting the State's attempt to overcome a best evidence rule challenge in an unemployment benefits fraud prosecution where "[t]he search for the original records was made

on the eve of trial and during the trial" and "[n]o one connected with [the defendant's employer] was produced to testify as to the unavailability of the [employer's] original records").

While there is little relevant case law in New Jersey touching on this issue, other jurisdictions with a best evidence rule similar to New Jersey's that have considered analogous situations have commonly held that the best evidence rule precludes admission of testimony regarding a video when the video footage itself is not available.[11] In those cases, the admission of the objectionable testimony has resulted in the reversal of the convictions.

In United States v. Bennett, 363 F.3d 947, 953 (9th Cir. 2004), for example, the Ninth Circuit Court of Appeals reversed the defendant's conviction for importation of marijuana because it was based, in large part, on a custom's officer's testimony that he had viewed a global positioning satellite (GPS) display showing the defendant's boat crossing from Mexican to United States waters. The court noted the GPS display was subject to the best evidence rule

_____

[11] An exception to this general theme is found in jurisdictions that, unlike New Jersey, do not consider videotape evidence to be a "writing" subject to the best evidence rule. See, e.g., Brown v. Commonwealth, 676 S.E.2d 326, 329 (Va. Ct. App. 2009) (noting that "Virginia adheres to the common law rules of evidence" and concluding that "in Virginia, the best evidence rule applies only to writings").

because it was "a graphical representation of data that the GPS had compiled about the path of [the defendant's] boat," and was "analogous to proffering testimony describing security camera footage of an event to prove the facts of the event instead of introducing the footage itself." Ibid.

The court pointed out that instead of producing the GPS itself or a duplicate, "the government offered only [the officer's] GPS-based testimony about an event—namely, a border-crossing—that he never actually saw." Id. at 954. Citing Fed. R. Evid. 1004, which is substantially similar to N.J.R.E. 1004,[12] the court explained:

> "Other evidence" of the contents of a writing, recording or photograph is admissible if the original is shown to be lost, destroyed or otherwise unobtainable. Fed. R. Evid. 1004. But the government made no such showing. When asked on cross-examination to produce the GPS or its data, [the officer] simply stated that he was not the GPS's custodian. He further testified that "there was no need to" videotape or photograph the data and that he had nothing other than his testimony to support his assertions about the GPS's contents. Moreover, the government has not offered any record evidence that it would have been impossible or even difficult to download or print out the data on [the defendant's boat's] GPS. On the record before us, the

---

[12] The only differences are that the federal rule addresses recordings while the New Jersey counterpart does not and subsection (b) of the federal rule provides an exclusion exception where "an original cannot be obtained by any judicial process" while the New Jersey counterpart adds the phrase "or procedure or by other available means." See Fed. R. Evid. 1004; N.J.R.E. 1004.

government is not excused from the best evidence rule's preference for the original.

[Ibid. (footnote omitted).]

State courts have also held police officer testimony regarding an unavailable video to be inadmissible. In Commonwealth v. Lewis, 623 A.2d 355 (Pa. Super. Ct. 1993), for example, the defendant was accused of retail theft in a Sears store. Id. at 356. After the defendant was apprehended by a store security guard, a police officer reviewed the video from a security camera. Ibid. At trial, the security guard testified "regarding his personal observations" of the defendant in the store, and the police officer testified "regarding what he observed on the tape, although he had not had the opportunity to observe [the defendant's] actions contemporaneously." Id. at 356-57. The video itself was not produced at trial, and the security guard testified that "he was unable to locate" it because it was "stored in the basement" of the store, "and the system whereby they are classified for storage is imprecise." Id. at 359.

The appellate court reversed the defendant's conviction and remanded for a new trial, holding that "this explanation concerning the unavailability of the tape was unsatisfactory" and "the original tape should have been produced." Ibid. The court explained:

We find that the facts in the instant case present the same type of circumstances which the best evidence rule was designed to guard against: a witness is attempting to testify regarding the contents of a videotape when the tape itself has not been admitted into evidence. The need to secure the original evidence itself, in order to insure that the contents of the evidence be given the proper weight, is apparent in this case. Thus, the best evidence rule should apply, in order to prevent any mistransmission of the facts surrounding [the defendant's] acts in the Sears store which might mislead the jury.

[Id. at 358.]

Applying Pennsylvania's common law best evidence rule, the court stressed "the contents of the tape" and the "interpretation of exactly what occurred" in the store were "crucial to a determination" of the defendant's intent and guilt, so the admission of the officer's testimony was reversible error and required a new trial, notwithstanding the security guard's firsthand account. Ibid.

Similarly, in Dyer v. State, 26 So. 3d 700, 702 (Fla. Dist. Ct. App. 2010), the appellate court reversed the defendant's conviction for stealing DVDs from a video store in a case where the store manager testified as to the contents of a surveillance video that the State had technical difficulties playing at trial. Over objection, the manager testified the surveillance video showed the defendant "in the back corner of our store farther back opening the DVD boxes and putting the DVDs into his pocket." Ibid. Although the State "resolved its technical

27

problems and published the surveillance recording to the jury" later in the trial, the appellate court held that the store manager's testimony violated the best evidence rule and its admission required reversal.  Id. at 702-04.

Citing Florida's statutory best evidence rule exceptions,[13] which parallel Fed. R. Evid. 1004 and are substantially the same as N.J.R.E. 1004, the Dyer court held that "[n]one of the enumerated exceptions apply here."  Id. at 703.  It explained that "[t]he state's inability to show the video recording due to temporary technical difficulties does not qualify the DVD as being 'lost or destroyed' within the meaning of the statute," and "the contents of the surveillance video were matters directly in issue."  Id. at 703.  The fact that "the jury later had an opportunity to view the original tape recording for themselves" did not render the admission of the store manager's testimony harmless because the "questionable testimony that the tape showed the defendant engaged in criminal conduct may have predisposed the jury to view the tape as incriminating and contributed to their guilty verdict."  Id. at 704.[14]

---

[13] Fla. Stat. Ann. § 90.954 (West 2008).

[14] The court also noted it was "baffled" by the State's contention that the surveillance video established the defendant's guilt because, reviewing the footage on appeal, the court's "observation of what the video depicts more closely coincides with the defense's version" of events that he removed DVDs

While we are not bound by authority in other jurisdictions, see, e.g., State v. Pickett, 466 N.J. Super. 270, 305 (App. Div. 2021) ) ("Although we ordinarily consider published decisions from other jurisdictions as persuasive, they are not binding on us."), we find the reasoning persuasive and strongly supportive of defendant's argument that Pedone's testimony regarding the contents of the surveillance video should have been excluded. Pedone's cursory efforts to secure the original recording fell far short of what was necessary to prove unavailability to justify admission of secondary evidence under N.J.R.E. 1004(b).

Defendant's argument that the surveillance video itself was never sufficiently authenticated is also persuasive. As our Supreme Court has explained,

> [t]o authenticate a photograph, testimony must establish that: (1) the photograph is an accurate reproduction of what it purports to represent; and (2) the reproduction is of the scene at the time of the incident in question, or, in the alternative, the scene has not changed between the time of the incident in question and the time of the taking of the photograph.
>
> [State v. Wilson, 135 N.J. 4, 15 (1994).]

---

from the shelf, looked at them, and put them back, but did not open the DVD cartridges or "conceal[] anything on his person." Dyer, 26 So. 3d at 702 n.1.

A-0628-23

See also State v. Brown, 463 N.J. Super. 33, 52 (App. Div. 2020) ("Authentication of a videotape is similar to the authentication of a photograph."); N.J.R.E. 901 (providing "the proponent must present evidence sufficient to support a finding that the item is what its proponent claims" to satisfy the requirements of authentication). Here, the Krauszer's employees did not testify and Pedone provided no details to establish the time the surveillance footage was taken or that it accurately depicted the store parking lot at the time of the robbery.

Defendant argues Pedone's testimony regarding the surveillance footage was also inadmissible as lay opinion testimony that did not meet the requirements of N.J.R.E. 701 "because it was not based on his direct perception of events or careful analysis of the video, and his testimony opined on factual disputes, infringing on the jury's role as the ultimate finder of fact." In support, defendant relies heavily on Watson, 254 N.J. 558, and Allen, 254 N.J. 530, two Supreme Court cases addressing police officer narration of video evidence that were decided less than one month after defendant's trial.

Lay opinion testimony is admissible subject to two conditions set forth in N.J.R.E 701. First, the lay witness's opinion must be "rationally based on the witness' perception"; second, the opinion must "assist in understanding the

30

witness' testimony or determining a fact in issue." N.J.R.E. 701. To satisfy the first condition, the "witness must have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." State v. Sanchez, 247 N.J. 450, 466-67 (2021) (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)). The second condition limits lay testimony only to that which will "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 469 (quoting State v. Singh, 245 N.J. 1, 15 (2021)); see also State v. Higgs, 253 N.J. 333, 363 (2023) (same). The second condition therefore precludes "lay opinion on a matter 'as to which the jury is as competent as [the witness] to form a conclusion.'" Sanchez, 247 N.J. at 469-70 (alteration in original) (quoting State v. McLean, 205 N.J. 438, 459 (2011)).

In considering how our case law has applied N.J.R.E. 701 to law enforcement officers narrating video recordings relating to the offense charged, our Supreme Court stated:

> In Higgs, we barred the lay opinion of a law enforcement officer who was not present at a shooting and testified that an object depicted in a surveillance video appeared to be a firearm. 253 N.J. at 365-67. Applying N.J.R.E. 701's "perception" prong, we noted that the detective "had no prior interaction or familiarity with either defendant or the firearm in question" and that "[h]is testimony was based entirely

on his lay opinion from watching the video." Id. at 366. We reasoned that "[t]he video was in evidence and the jury should have been permitted to view it slowly, frame by frame, to determine for themselves what they saw on screen, without the influence of opinion testimony by an officer who was not there at the time." Id. at 367. We held that the officer's testimony had invaded the jury's province. Id. at 366-67. We did not, however, "rule out the possibility of allowing a law enforcement officer to testify about a sequence in a video that is complex or particularly difficult to perceive." Id. at 367.

In State v. Watson, . . . we addressed the admissibility of a police officer's narration of a video of a bank robbery at which the officer was not present, and held that the narration exceeded the bounds of proper lay opinion testimony under N.J.R.E. 701 and N.J.R.E. 602[15] when the officer provided commentary about the suspect's actions during the robbery. Watson, 254 N.J. at 606-08. We disapproved of portions of the officer's narration testimony that reflected his subjective belief of what occurred in the surveillance video, including observations about alleged efforts by the suspect not to touch surfaces during the robbery and a comment that "the suspect was very careful in . . . not attempting to leave any type of evidence behind." Id. at 608.

[Allen, 254 N.J. at 544-46 (alterations and last omission in original) (citations reformatted).]

---

[15]   N.J.R.E. 602 provides that other than expert witnesses, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

A-0628-23

In Allen, decided the same day as Watson, a central question was whether the defendant accidentally or intentionally fired a handgun at a police officer who was chasing him. Allen, 254 N.J. at 537-38. The officer gave a firsthand account that "as defendant ran into a vacant lot, he 'turned 180 degrees, that would be counterclockwise, raised the handgun and fired at me' from a distance of eighteen to twenty-four feet." Id. at 537. In contrast, the defendant acknowledged that he ran from the officer but testified the gun discharged accidentally when he was trying to throw it away. Id. at 538.

Much of the incident was captured on two surveillance videos from a nearby building, which were shown to the jury at trial. Id. at 535. As part of his investigation, the lead detective "used the videos to locate areas of interest for his processing of the crime scene." Id. at 539. At trial, over defense counsel's objection, the trial court allowed the lead detective to testify about the videos because they informed his investigative strategy. Id. at 539-40.

Noting that "[n]either counsel nor the trial court identified N.J.R.E. 701 as a rule of evidence governing the admission of [the detective's] testimony," id. at 540, the Supreme Court explained:

> [T]he trial court permitted the lead detective in the investigation, who was not at the scene of the shooting, to narrate the surveillance video of the incident in his testimony before the jury. Most of the detective's

narration focused on his use of the video as he investigated the crime scene. In several comments, however, the detective opined that the video showed defendant turning toward the officer and firing his handgun, thus suggesting that defendant intentionally fired his weapon at the officer.

[Id. at 535.]

After reviewing the details of the lead detective's testimony, the Court concluded the trial court had "properly permitted the detective to testify about the manner in which he used the surveillance video to guide his investigation." Id. at 535, 540-41. According to the Court, "[t]hat testimony included two categories of admissible evidence: fact testimony from a forensic investigator about the steps he took at the crime scene, and testimony rationally based on the witness's perception and helpful to the trier of fact." Id. at 548.

However, relying on the principles enunciated in Watson, the Court held "the detective's testimony opining that the video showed defendant turning and firing his weapon should have been excluded from evidence." Id. at 535. The Court stated the detective's "comments about defendant's actions were improper" because he "was not present on the scene and had no personal knowledge of the incident" but "testified in support of the State's position as to sharply disputed facts." Id. at 549.

A-0628-23

After reviewing other jurisdictions' handling of the subject, the <u>Watson</u> Court held that "Rules 701, 602, and 403 provide a framework for the admission of narration evidence" by "a witness who did not observe events in real time." <u>Watson</u>, 254 N.J. at 600, 602.  The Court instructed:

> [W]hether narration evidence is helpful turns on the facts of each case.  Rule 701's helpfulness prong can be satisfied when an investigator draws attention to key details that might be missed, or helps jurors follow potentially confusing, complex, or unclear videos that may otherwise be difficult to grasp.  Counsel may offer other reasons to allow limited narration testimony, which courts should evaluate with care.
>
> Narration testimony must also comply with N.J.R.E. 403.  The rule guards against the risk of "[u]ndue prejudice, confusion of issues, . . . misleading the jury, . . . [and] needless presentation of cumulative evidence."  Placing appropriate limits on narration testimony can help avoid those problems.
>
> [<u>Watson</u>, 254 N.J. at 602 (omissions and last two alterations in original).]

The Court cautioned that such testimony "must accord with specific limits."  <u>Ibid.</u>  First, "continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording" must be avoided.  <u>Id.</u> at 603.  Second, investigators may "describe what appears on a recording but may not offer opinions about the content.  In other words, they can present objective, factual comments, but not subjective interpretations."  <u>Ibid.</u>  "Third,

investigators may not offer their views on factual issues that are reasonably disputed," as "[t]hose issues are for the jury to decide." Ibid. Finally, while "lay witnesses generally may offer opinion testimony under Rule 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence. That type of comment is appropriate only for closing argument." Id. at 604. The Court explained that, "[c]onsistent with those principles, an investigator who carefully reviewed a video in advance could draw attention to a distinctive shirt or a particular style of car that appear[s] in different frames, which a jury might otherwise overlook," if those issues are not in dispute. Ibid.

Applying these principles, we are persuaded Pedone provided lay opinion narration testimony that did not meet the requirements of N.J.R.E. 701 or the limitations ascribed in Watson and Allen. As a result, we conclude much of Pedone's testimony about the contents of the surveillance footage should have been excluded. We acknowledge that in Watson and Allen, the Court expressly considered narration of video evidence shown to a jury, rather than a description of an absent video as occurred here. However, the Court's reasoning and holding—based largely on the risk that testimony about a video risks usurping the jury's exclusive province of finding the facts in the case—are equally

36

compelling in a case like this where the jury had no opportunity to view the video itself.

Indeed, the risk of invading the province of the jury is increased exponentially when the jury does not see the source video evidence and must rely solely on the officer's commentary for its content. See In re Stern, 11 N.J. 584, 588 (1953) ("The resolution of the facts is the exclusive province of the jury, and an invasion of the independence of that tribunal vitiates the verdict."); State v. Rivera, 437 N.J. Super. 434, 449-50 (App. Div. 2014) (noting that "[o]ur Supreme Court has consistently condemned conduct that invades the exclusive province of the jury to resolve factual disputes, assess credibility and decide whether the State's evidence establishes guilt").

Among other things, Pedone testified:

- Suspect 2 reached into Byham's vehicle from the driver's side window "[a]nd it appears that he takes something";

- Suspect 2 "start[s] looking through the trunk";

- Suspect 1 exited Byham's car "where it appears that he runs towards a fence where the wood line is";

- "And then is [sic] observed that Suspect 1 turns and points an unknown object at the victim, Edward Byham, where it is observed that [Byham] falls to the ground and appears to duck for cover";

37

- The third individual in the car did not get out of the car;

- The person depicted in S-5 was not the third individual, but Suspect 2 ("It's believed that he took off the dark jacket from watching the surveillance footage"; "Due to the surveillance cameras being somewhat blurry at times, I was unable to completely identify, but I believe that that was the second suspect.").

Clearly, Pedone's testimony included opinions and inferences subject to N.J.R.E. 701. However, the State failed to satisfy the Rule's requirements. First, Pedone simply viewing the "blurry" footage one time while pausing occasionally to take still shots does not satisfy the requirement that the opinions or inferences must be "rationally based on the witness' perception." See Watson, 254 N.J. at 569, 572-73 (noting that the investigating officer "watched the bank's surveillance videos 'numerous times'" and holding that the "perception" prong can be satisfied where an investigator "has carefully reviewed a video recording"). Further, because Pedone's opinions and inferences were based on a review of source evidence unavailable for jury review, his testimony could not "assist" the jury "in understanding" that evidence. See Higgs, 253 N.J. at 365-67 (barring lay opinion of law enforcement officer that object in video appeared to be a firearm because it "usurp[ed] the jury's assessment of" disputed facts).

Even Pedone's "purely factual" testimony runs afoul of the dictates of Watson and Allen. For example, Pedone testified:

38

- Suspect 1 got out of the driver's seat of the suspect car, approached Byham's car, and got into the passenger seat;

- Suspect 2 transferred from the rear of the suspect vehicle to the driver's seat, "then drove down the lot and turned back around to where the vehicle is now facing Deal Road";

- Suspect 2 "then ultimately runs back to his vehicle and drives off."

Pedone's testimony was essentially a continuous commentary on the contents of the surveillance footage encompassing the critical facts that defendant reasonably disputed, such as whether he arrived in the suspect vehicle or on foot, approached Byham's car and participated in the robbery, or did anything to threaten Byham as he was leaving the scene. Such testimony violated the Watson Court's prohibition against "an investigator whose knowledge is based only on viewing the recording" offering "continuous commentary" or stating "views on factual issues that are reasonably disputed." Watson, 254 N.J. at 603. Thus, we are convinced that except for testimony relating specifically to his use of the video in connection with performing an investigation and creating the still shots, Pedone's testimony regarding the surveillance footage and its contents should have been excluded.

Our determination that the judge erred in not excluding the testimony does not end the inquiry. "We must also decide whether the trial court's error was 'harmless beyond a reasonable doubt.'" State v. Bass, 224 N.J. 285, 307-08 (2016) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)). Accord State v. Prall, 231 N.J. 567, 581 (2018) ("Our review of the evidentiary determinations cannot end our analysis when we find an abuse of discretion; rather, we must then determine whether any error found is harmless or requires reversal."); State v. Jackson, 243 N.J. 52, 72-73 (2020) (noting that the reviewing court considers whether the error raises a reasonable doubt as to whether the jury might have reached a different result). See also Allen, 254 N.J. at 550 (noting that "in appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial"); State v. Wade, 252 N.J. 209, 221 (2022) (noting that the erroneous admission of evidence could be harmless in "an instance of overwhelming, direct evidence" that was properly admitted, but finding evidence that "undoubtedly tarnished [the] defendant's credibility in the eyes of the jury" was harmful).

A-0628-23

The properly admitted evidence in this case was far from "overwhelming." There were no still photos from the video surveillance footage showing defendant in Byham's car, no forensic evidence tying defendant to either car, and no weapon recovered. Indeed, the prosecutor's closing argument essentially acknowledged that the eyewitness testimony was suspect and urged the jury to give greater weight to Pedone's description of the surveillance footage. The prosecutor described Byham, Pelzer, and defendant as "interesting characters" who "were all buying and selling drugs" and who all had "prior criminal histor[ies]." The prosecutor highlighted the specific ways in which the surveillance footage corroborated Byham's statement and Pelzer's testimony and contradicted defendant's contention that he did not participate in the robbery.

In essence, the prosecutor urged the jury to give dispositive weight to Pedone's testimony based on him viewing the surveillance footage,[16] stating:

> But you heard from the officer who testified. Officer Pedone watched the defendant on the surveillance footage. The defendant admits that this is him on the footage. Officer Pedone watched what this person did on the footage. He got out of the car, and he got in the car with the victim and then he got out of the victim's

---

[16] During deliberations, the jury requested a playback of Pedone's testimony. See State v. R.E.B., 385 N.J. Super. 72, 90 (App. Div. 2006) ("Since the jury asked for the playback, the [played-back] testimony must have been considered significant.").

41

car, and he ran to the fence line after pointing an object at the victim. That's what this person did.

He never went into the store. It's not on the footage. So, he was being untruthful about going into the store, going to the ATM.

We are satisfied the improper admission of Pedone's testimony cannot be considered harmless beyond a reasonable doubt. To the contrary, the erroneous admission of Pedone's testimony regarding the substantive content of the absent surveillance video footage combined with the violation of N.J.R.E. 1004 compels the reversal of defendant's conviction and sentence and a remand for a new trial. Based on our decision, we need not address defendant's remaining arguments.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

42